**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | | |
|---|---|---|---|
| In re: | ) | | |
| | ) | | |
| **CLOVERLEAF ENTERPRISES, INC.** | ) | **Case No. 09-20056 PM** | |
| | ) | **Chapter 11** | |
| **Debtor.** | ) | | |
| _____ | ) | | |

**RENEWED MOTION PURSUANT TO §§ 363 AND 365**
**OF THE BANKRUPTCY CODE FOR AUTHORITY TO SELL**
**SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS**
<u>**FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**</u>

Cloverleaf Enterprises, the debtor and debtor-in-possession, (the "Debtor"), by its

counsel, files this Renewed Motion Pursuant to §§ 363 and 365 of the Bankruptcy Code for

Authority to Sell Substantially All of the Debtor's Assets Free and Clear of Liens, Claims and

Encumbrances, and in support thereof states:

<u>**Jurisdiction**</u>

1.      This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and

1334.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The relief sought in this Motion is based upon §§ 363 and 365 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of

Bankruptcy Procedure and Local Rule of Bankruptcy Procedure 6004-1.

<u>**The Debtor and Its Business Operations**</u>

4.      The Debtor owns and operates Rosecroft Raceway on 124 acres located in Fort

Washington, Maryland.  The Raceway has been in operation since 1949 and hosts standardbred

horse racing throughout the year.  In addition, Rosecroft accepts simulcast transmissions of

standardbred, thoroughbred and quarterhorse racing from around the world and allows pari-mutuel betting.

**Debtor's Obligations to Secured Creditors**

5.      On April 1, 2007, the Debtor executed Variable Rate Term Notes, series 2007 A, CUSIP number 189232 AA9 in the original principal amount of $7,350,000 (the "Notes"), secured by the Master Indenture of Trust (the "Master Indenture"), as supplemented by the Series 2007 A Supplement (the "Supplement") and with the Master Indenture, (the "Indenture") each dated as of April 1, 2007, between the Debtor and Wells Fargo Bank, N.A. as trustee (the "Trustee").  The Notes are registered on the registration books of the Trustee in the name of Cede & Co., nominee of The Depository Trust Company.  Cede & Co. holds the Notes for numerous beneficiaries.  As of the petition date, the obligation under the Notes was approximately $6,800,000.

6.      The Notes were backed by an irrevocable letter of credit (the "Letter of Credit") in the initial stated amount of $7,470,822, issued by Mercantile-Safe Deposit and Trust Company ("Mercantile") in favor of the Trustee.  Mercantile has been succeeded by PNC Bank.  As collateral for the Letter of Credit, there is a Deed of Trust and a Security Agreement granting a first priority lien to PNC Bank on substantially all assets of the Debtor.  On or about September 30, 2009, the Letter of Credit was called by the Trustee.  The Notes have been paid and pursuant to the terms of a Reimbursement Agreement, the Debtor is now indebted directly to PNC Bank. This obligation is sometimes hereinafter referred to as the "PNC Obligations."

**Debtor's Current Financial Position**

7.      This Chapter 11 case was initiated by the Debtor in order to attempt to reorganize its business.  The Debtor became cognizant of the fact that its operation was not generating

sufficient cash flow to meet its obligations to PNC Bank and to its other creditors.  It realized

that in a relatively short period of time it would run out of money and be in default to PNC Bank

and upon a default, PNC Bank would most likely move to foreclose on its collateral — spelling

the end of the operation of the racetrack.  Because of its precarious cash flow situation and a like

position with PNC Bank, the Debtor concluded that it was in the best interest of the Debtor and

its creditors to sell the business and maximize the recovery to Debtor's creditors.  With that goal

in mind, the Debtor has recently entered into several agreements with Rosecroft Future, LLC

("Future LLC"), an entity owned or controlled by Mark and Susan Vogel, to purchase

substantially all of the Debtor's assets and to assume certain of the Debtor's executory contracts,

subject to the approval of both the Bankruptcy Court and the issuance of a racing license to

Future LLC by the Maryland Racing Commission.  Future LLC is acquiring Rosecroft Raceway

as a standardbred and quarter horse facility to receive and send only standardbred simulcast

signals. If the sale is approved, Future LLC will operate the racetrack and continue to employ a

substantial number of the approximately 200 current employees.

**The Agreements to Sell Substantially All of the Assets of the Debtor**

8.    Closing on the sale of the Debtor's assets is contingent upon the approval by the

Bankruptcy Court of the Debtor's execution of the Amended and Restated Real Estate

Agreement and the Amended and Restated Personal Property Agreement and the execution by

CSOA of the Amended and Restated Purse Agreement, all as more fully described below.  The

Debtor entered into two agreements with Future, LLC:  (1) the Amended and Restated Real

Estate Purchase and Sale Agreement (the "Real Estate Agreement"); (2) the Amended and

Restated Personal Property (Operating Assets) Purchase Agreement (the "Personal Property

Agreement").  The Real Estate Agreement contains the terms of sale of the Debtor's  real

property and improvements thereon.  The Personal Property Agreement describes the terms under which the Debtor will sell its personal property to Future, LLC.

9.     There is a third agreement that is an integral part of the transactions.  The third agreement is an Amended and Restated Purse Agreement between Cloverleaf Standardbred Owners Association ("CSOA"), the parent company of the Debtor, and Future LLC (the "Purse Agreement").  Because the Debtor is not a party to the Purse Agreement, it is not seeking court approval of the Purse Agreement.  However, in the interest of full disclosure to the Court and creditors of all of the facts and circumstances surrounding the proposed sale, the Debtor provides herein a summary of the Purse Agreement and attaches a copy of that Agreement to this Motion.

10.     The Real Estate Agreement, the Personal Property Agreement and the Purse Agreement are collectively referred to as the "Companion Agreements."  Execution of each of the three Companion Agreements and Closing under all of the Agreements is a condition subsequent to the efficacy of each of the Companion Agreements.

11.     The following sections contain a  brief summary of each of the Companion Agreements, and parties in interest are advised to carefully review the Companion Agreements in order to fully understand the proposed sale transaction.

### The Real Estate Agreement

12.     Under the Real Estate Agreement dated December 11, 2009, Debtor sells and Future LLC purchases approximately 124 acres of real property, commonly known as Rosecroft Raceway (the "Land") and the buildings thereon containing an area of approximately 125,198 square feet as well as a single family dwelling, and any and all furniture, fixtures and equipment contained therein (collectively, the "Property").

13.     The Purchase Price, payable at Closing, is the sum required (including legal fees and costs) to either assume or pay off the debt associated with the PNC Obligations.  The Real Estate Agreement further provides that Future LLC shall pay, at Closing, all recordation and transfer taxes and other charges incident to the recording of the deed for the Property and any other documents required by PNC Bank (or the holder of the PNC Obligation).

14.     As part of the Real Estate Agreement, the Debtor acknowledges that Future LLC may realize a significant discount on the PNC Obligations as a result of the depressed value of real estate.  At Closing, Future LLC shall either acquire the PNC Obligations or refinance them by obtaining alternative financing.  In any and all events, the financing of the Property will relieve the Debtor of the PNC Obligations.

15.     Future LLC has completed due diligence and assumes full responsibility for all environmental matters.

16.     Future LLC and it agents and representatives has performed inspections of the Property and the books and records of the Debtor to gain familiarity with the Property. Furthermore, Mark Vogel, Future, LLC's managing member, once owned Rosecroft Raceway and is familiar with its positive and negative aspects.

17.     Future LLC acknowledges and agrees in the Real Estate Agreement that is purchasing the property **"AS IS, WITH ALL FAULTS AND WITHOUT ANY WARRANTIES EXPRESS OR IMPLIED."**

18.     Future LLC has sought, from the Maryland Racing Commission (the "MRC"), a new racing license to allow standardbred or quarter horse racing on the Property and the issuance of simulcast approvals to operate a standardbred race track and Off Track Betting ("OTB") facility dealing with harness racing only with full rights  to send and receive standardbred

2449915.1

signals.  If Future LLC is unable to obtain such approval prior to the Closing Date, upon

notification to the Debtor of Future LLC's inability to obtain MRC approval, the Real Estate

Agreement will terminate.  The Real Estate Agreement further provides that Future LLC may

terminate the Real Estate Agreement at any time following notice that the MRC has scheduled a

hearing or is otherwise prepared to take action that will or is likely to have the effect of

terminating the racing license of the Debtor or to not approve the license application of Future

LLC.

19.     The Closing shall take place no later than February 28, 2010 (the "Closing Date"),

unless otherwise agreed to by the Debtor and Future LLC.

20.     Time is of the essence in every aspect of the transaction.

21.     As stated above, the Companion Agreements are materially interdependent and

Closing under all of the agreements is a condition subsequent to the efficacy of each of the

Companion Agreements.

22.     A copy of the Real Estate Agreement is attached hereto as **Exhibit 1**.

**The Personal Property Agreement**

23.     Under the Personal Property Agreement between the Debtor, as seller, and Future

LLC, as buyer, Future LLC will purchase and the Debtor shall sell free and clear of any claims,

liens or encumbrances, except as noted, all furniture, fixtures, equipment, supplies and other

personal property of every nature and description, being all of the assets used in connection with

the Business,  including all intangible property rights including, without limitation, the name

"Rosecroft Raceway" (the "Business Assets").  Future LLC shall not purchase the excluded

assets described in Exhibit A.  Assets excluded from the sale include all cash on hand, accounts

and sums receivable, including all sums due or credits accrued to the Debtor under the Cross-

2449915.1

Breed Revenue Sharing Agreement (defined below), disbursements due from Maryland OTB Facilities, LLC, New Maryland OTB Facilities, LLC and on account of Electronic Wagering (telephone, computer and internet wagering), as of the close of business on the day prior to Closing.  Any and all causes of action to recover from third parties are also Excluded Assets.

24.     The Debtor also agrees to assign its rights, title and interest in the distribution rights from Electronic Wagering described and identified in the Cross-Breed Horseracing Revenue Sharing and Operations Agreement of January 1, 2000 (the Cross-Breed Revenue Sharing Agreement") accruing after close of business on the day prior to the Closing Date.  In connection with this assignment, Future LLC does not assume any liability under the Cross-Breed Simulcasting Memorandum of Understanding Between Laurel Park, Pimlico Race Course and Rosecroft Raceway and the Respective Horsemen and Breeders Organizations dated March 28, 2006, as amended (the "Cross-Breed Simulcasting MOU").

25.     Subject to the approval of the Board of License Commissioners of Prince George's County, the Debtor will sell its 100% interest in Rosecroft Food Services, LLC to Future LLC.  The purchase price of the Rosecroft Food Services interest is in an amount equal to so much of the prorated liquor license fee as is unused at Closing and the wholesale value of unused food and beverages as of the close of business the day before Closing, less outstanding unpaid operating expenses, i.e. a nominal value.

26.     As is more fully described in the Debtor's motion to and assume and assign executory contracts, Future LLC may elect to assume such executory contracts as it deems desirable and appropriate.  As to those contracts, Future LLC shall be responsible for the payment of sums required to cure any monetary defaults under  such contracts, including monetary defaults under any assumed simulcast contracts with out of state race tracks.

2449915.1

27.     The Purchase Price to be paid for the Business Assets is One Hundred Thousand Dollars ($100,000), plus the sum paid by Future LLC in connection with the transfer of the Debtor's interest in Rosecroft Food Services, LLC, including its liquor license and its unused food and beverage  (the "Purchase Price").

28.     Future LLC will assume (and secure the release of Debtor) or pay off the PNC Obligations.  With the exception of the Cross-Breed Revenue Sharing Agreement and any other executory contracts that the Debtor assumes and assigns to Future LLC, Future LLC will not assume any additional liabilities of Debtor which have accrued to the date of Closing or thereafter.

29.     The Debtor agrees to indemnify Future LLC for and against any liability, cost or expense arising out of or relating to claims made against the Debtor or the Business Assets which relate to claims made by creditors of the Debtor or relate to the operation of the business prior to the Closing Date.  The Debtor will not indemnify Future LLC from and against any liabilities associated with the PNC Obligations or against sums due to acquire or maintain executory contracts as described in the Personal Property Agreement.  The limit of the Debtor's indemnity obligation is the Purchase Price.

30.     CSOA , the Debtor's parent company, shall have no liability to indemnify under the Personal Property Agreement or the Real Estate Agreement.

31.     Either party to the Personal Property Agreement may terminate the Agreement upon written notice following the receipt of notice that the MRC has scheduled a hearing or is otherwise prepared to take action that will have or is likely to have the effect of not issuing a racing license or standardbred simulcast rights applicable to Rosecroft to Future LLC.

2449915.1

32.    As stated above, the Companion Agreements are materially interdependent and Closing under all of the agreements is a condition subsequent to the efficacy of each of the Companion Agreements.

33.    A copy of the Personal Property Agreement is attached hereto as **Exhibit 2**.

**Purse Agreement**

34.    Future LLC and CSOA, the Debtor's parent company, have entered into a Purse Agreement to which the Debtor is not a party.  Because the Purse Agreement is an integral part of the sale of the Debtor's assets, the Debtor believes it is appropriate to describe the purpose of the Purse Agreement, the benefits to be derived by CSOA from the Purse Agreement and to fully describe its terms.

35.    CSOA and Future LLC are committed to providing a high quality standardbred racing facility and to fostering  healthy competition at Rosecroft.  To make Rosecroft a high quality racing facility with high quality standardbred horses and to attract wagering, Rosecroft must stimulate interest in the races run at the facility.  The most successful way to stimulate interest in the races is to increase the size of the purses associated with the races run at Rosecroft. The Purse Agreement provides a source of continuous, stable funding that will be used to increase the size of the purses over the term of the Purse Agreement.  As demonstrated at racetracks in Delaware and West Virginia, substantial purses generate competition which stimulates public interest and wagering.

36.    CSOA's members consist of a majority of the owners and trainers of standardbred horses who participate in live harness racing in Maryland and other states.  CSOA is the sole entity authorized to grant consents and enter into contracts required by the Interstate Horseracing Act and the Maryland Horseracing Act, as a prerequisite to approval of the interstate and

intrastate simulcasting of standardbred races and pari-mutuel wagering thereon at Rosecroft.  In other words, CSOA's consent is required for Rosecroft to run live races, to transmit races to other locations and to receive transmissions of races run at other facilities.

37.    In consideration of the payment of amounts described below, CSOA agrees, as the entity authorized by the owners and trainers of standardbred horses, to deliver the consent of its members and approve: (1) the transmission of Rosecroft's live racing signal to any all venues or outlets throughout the United States and the world; and (2) the receipt and retransmission of simulcast of standardbred racing from any venue or site throughout the United States or the world and to accept pari-mutuel wagering on such races.  Additional consideration provided by CSOA is described below.

38.    The Purse Agreement will remain in effect for twenty (20) years following the Effective Date of the Agreement which is the Closing Date under the Real Estate Agreement or the Personal Property Agreement.

39.    To obtain the consent, support of CSOA, and live racing in the future, Future LLC shall pay CSOA the following:

a.    $1,150,000 during the one-year period following the Closing, payable $200,000 at Closing with additional payments of $200,000 each on April 1, 2010, May 1, 2010, October 1, 2010, November 1, 2010 and $150,000 on December 1, 2010.

b.    $1,000,000 to fund purses at Rosecroft in 2011, payable with payments of $142,858.00 on January 1, 2011, February 1, 2011, March 1, 2011, April 1, 2011, May 1, 2011, October 1, 2011, and November 1, 2011.

c.    If in 2009 and 2010 (i) there are neither video lottery terminals at Rosecroft or payments being made to the licensee at Rosecroft by the Comptroller of Maryland

10

for standardbred purses from the proceeds of slots operating elsewhere in Maryland; or (ii) if there are no card room gaming operating at Rosecroft, in addition to other payments, Future LLC shall remit to CSOA, on a monthly basis, 1.5 % of the Gross Handle for all gaming sources available to Future LLC for the remainder of 2009 and calendar year 2010.  "Gross Handle" is defined in the Purse Agreement.  The 1.5% of the Gross Handle shall be devoted exclusively to purses.

        d.      In 2011 and thereafter during the Term of the Purse Agreement, 1% of the Gross Handle will be paid to CSOA or its successor to fund purses.

        e.      In addition to the payments described above, Future LLC shall pay CSOA 2.5% of Gross Handle which may be used for operating expenses, but no less than 1% of Gross Handle shall be used for purse supplementation.  Gross Handle is currently $30,000,000 per year.

40.      If during the term of the Purse Agreement, video lottery terminals ("slots") are approved for installation at Rosecroft, Future LLC will pay $7,500,000 to CSOA.

41.      If during the Term, card room legislation is approved, Future LLC shall make additional payments to CSOA as follows: (a) $500,000 within 60 days of a card room being open at Rosecroft; (b) $500,000 on the first anniversary of the initial payment; (c) $1,000,000 on the second anniversary of such initial payment.

42.      If during the Term either slots or card rooms are available at Rosecroft, Future LLC will make an additional $750,000 annual payment to CSOA for purse enhancement or otherwise, as CSOA determines.

43.      As noted above, as consideration for payments to be received under the Purse Agreement, CSOA grants to Future LLC for the Term, while Future LLC is operating Rosecroft pursuant to a valid racing license, or OTB facility: (1) consent and approval to send Rosecroft

Raceway's live racing to any and all venues throughout the United States and the world; (2) the consent and approval to import, receive and re-transmit simulcasting of racing from any venue or site throughout the United States or the world and to accept pari-mutuel betting thereon. CSOA further agrees that Future LLC shall have: (1) the sole and exclusive right to determine the price, types of races and schedule of simulcast signals to and from Rosecroft Raceway, along with all OTB facilities and account wagering activities controlled or jointly owned by Future LLC; and (2) the approval to establish off-track betting facilities and account wagering activities at any location within the State of Maryland or elsewhere in the United States or the world.

44.    As set forth below, the Debtors believe that approval of the Agreement and consummation of the proposed sale is in the best interests of the Debtor, its estate and creditors.

45.    A copy of the Purse Agreement is attached hereto as **Exhibit 3**.

## Relief Requested

46.    By this Motion, the Debtor seeks approval of the Real Estate Agreement and the Personal Property Agreement with Future LLC, and authority to consummate the transactions contemplated by the Agreement.

47.    The proposed sale of the real and personal property of the Debtor to Future LLC is expressly subject to Court approval.

## Authority to Use or Sell Property Out of the Ordinary
## Course of Business Pursuant to § 363(b)(1)

48.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

49.    The Debtor proposes to sell substantially all of its assets to Future LLC, an entity controlled by Mark and Susan Vogel.

2449915.1

50.     When a debtor wishes to sell substantially all of its assets pursuant to Section 363(b), instead of including the sale as part of a plan of reorganization, more than cursory scrutiny of the sale and allocation process is required by the Bankruptcy Court.  *Mission Iowa Wind Co. (In re Enron)* 291 BR 39 (D.S.D.N.Y. 2003); *In re Castre*, 312 BR 426 (Bankr. D. Colo. 2004).

52.     The standard governing sales pursuant to Section 363(b) in the Fourth Circuit is the "sound business purpose" test.  *In re: W.A. Mallory Company, Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *In re WBQ Partnership*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); *In re Naron & Wagner*, 88 B.R. 85 (Bankr. D. Md. 1988).

53.     The "sound business purpose" test requires the Debtor to establish four elements to sell property outside of the ordinary course of business:

> (a)     that a "sound business purpose" justifies the sale of assets outside the ordinary course of business;
>
> (b)     that adequate and reasonable notice has been provided to interested persons;
>
> (c)     that the debtor has obtained a fair and reasonable price; and
>
> (d)     good faith.

*In re WBQ Partnership*, 189 B.R. at 102 (citing *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 176 (D. Del. 1991).  The proposed sale is justified under section 363(b) because it satisfies all of the factors under the applicable test.

A.     <u>**The proposed sale is supported by sound business judgment**</u>

54.     The Debtor proposes to sell substantially all of its assets, both real and personal property to Future LLC.  The Debtor further proposes to assume and assign certain executory

contracts to Future LLC, including those that permit transmission and receipt of standardbred races.

55.     Briefly stated, Future LLC will assume or refinance the PNC Obligations.  While the Debtor is not in monetary default under the PNC Obligations, the Debtor expects that, due to declining revenue, it will become increasingly difficult for it to meet its obligations on the Notes. The assumption or refinance of the PNC Obligations will provide a substantial benefit to the Debtor because the Debtor's remaining assets will no longer be subject to a PNC lien.  Future LLC also proposes to pay $100,000 for personal property assets of the Debtor.  Finally, as will be more fully described in its motion to assume and assign executory contracts, the Debtor will assign certain executory contracts, including those that facilitate or permit simulcasting of out of state races.  Future LLC will satisfy the defaults associated with such contracts and provide adequate assurance of future payments, thus affording some relief to some of the Debtor's unsecured creditors.

56.     Debtors are not permitted to enter transactions that amount to a *sub rosa* plan of reorganization or to attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization.  If, however, the transaction has a "proper business justification" which has potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized.  *In re Chrysler LLC*, 405 B.R. 804 (Bankr. S.D. N.Y. 2009) (quoting, *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452,467 (2nd Cir. 2007)).

57.     With Court approval, a debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation  providing for the distribution of the proceeds of the sale if it articulates a good business reason for taking such action.  *In re Chrysler LLC*, 405

2449915.1

B.R. 804 at 95-96; *In re Naron & Wagner, Chtd*. 88 B.R. 85 (Bankr. D. Md. 1988). The *Chrysler* Court stated:

> This strategy is employed, for example when there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources of financing. *Id*. at 97.

Similarly, the Court in *In re Castre* concluded that the debtor's decision to sell the assets by sale motion was sound since the Chapter 11 case could not continue as an operating business and the debtor's assets were decreasing in value. *Castre* at 428. Without a continuing and substantial infusion of capital necessary to pay purses for live horse racing and to maintain its facilities, the Debtor will not be able to profitably operate the racetrack once Rosecroft is compelled to begin live racing again in October 2010.

58.     The *Chrysler* Debtors established a good business reason for the sale of their assets early in the Chapter 11 cases. They established that the Fiat transaction was the only viable transaction. The only other alternative was the immediate liquidation of the company. Further, the Court surmised that the whole enterprise would be worth more than the sum of its parts. The Court concluded that approval of the sale was necessary to preserve some portion of the going concern value of the Chrysler business and to maximize the value of the Debtors' estates.

59.     Similar factors support the Debtor's business reasons for proposing a sale of substantially all of its assets. As stated above, the Debtor has sought a purchaser for a substantial period, but has never been able to consummate a sale. The Future LLC offer is the only option available to the Debtor. The only other alternative is immediate liquidation. If the business ceases to operate, most of the approximately 200 employees will immediately lose their jobs. Furthermore, the Debtor believes that the whole enterprise is worth more than the sum of the

2449915.1

parts.  If liquidated, the Debtor's assets will precipitously decline in value.  The decline in value would occur, in part, because the Debtor's physical assets would have little more than scrap value to any business other than another racetrack.  By proposing the sale, the Debtor is exercising its fiduciary duty by electing the only option available, other than piecemeal liquidation.  Like the *Chrysler* Debtors, the Debtor has established a good business reason for the sale of its assets at the early stage of the case.

60.    Another factor that supports the Debtor's decision to propose a sale of assets rather than making the sale of assets part of a plan of reorganization is the requirement contained in the Real Estate Agreement that the Debtor continue to operate the business until Closing.  If the Closing does not occur quickly, the Debtor may not have sufficient funds to continue to operate the facility.  If the facility ceases operation, Future LLC could assert that the Debtor breached the agreement, allowing Future LLC to terminate all of the agreements.

61.    Unlike the sale contemplated by the Court in *Pension Benefit Guar. Corp. Continental Airlines, Inc. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983), this Motion is not a *sub rosa* plan because it does not dictate the terms of any future reorganization plan, restructure the rights of creditors or require all parties to release all claims against the debtor, its officers, directors and secured creditors.  *In re Condere Corporation*, 228 B.R. 615, 627 (Bankr. S.D. Miss. 1998) (simple exchange of cash for assets was not a *sub rosa* plan).  Instead, similar to the sale motion  approved in *Naron & Wagner*, the Debtor seeks only to liquidate assets, and the sale will not restructure rights of creditors.  *Naron & Wagner* at 88.  Thus, the Debtor's Sale Motion is  not a *sub rosa* plan.

The sale to Future LLC is supported by sound business justification and is in the best interest of the Debtor's estate.

2449915.1

**B.**    **The Trustee Has Provided Adequate Notice of the Sale.**

62.    Consistent with the requirements of Bankruptcy Rules 2002 and 6004, Local Rule 6004-1 and applicable case law, the Debtor has prepared and served a detailed notice of the Companion Agreements upon the United States Trustee and those required to be notified pursuant to Rule 2002 of the Bankruptcy Rules (the "Sale Notice").  As required by *Naron & Wagner*, the notice will provide enough information to alert interested parties that this is their last chance to be heard prior to the Debtor filing a plan of reorganization to distribute the proceeds of liquidation in accordance with the priority of each creditor.  *Naron & Wagner* at 88.  *Naron & Wagner* provides that the notice should:  (1) place all parties in interest on notice that the Debtor is liquidating its business under Chapter 11; (2) disclose accurately the full terms of the sale, including the identity of the purchaser; 3) explain the effect of the sale as terminating the debtor's ability to continue its business; and (4) explain why the proposed price is reasonable and why the sale before confirmation is in the best interests of the estate.  *Id*. at 89.  The Sale Notice meets the requirements for notice of a sale of substantially all of a Debtor's assets identified in *Naron & Wagner* and those requirements contained in Local Rule of Bankruptcy 6004-1.

**C.**    **The Proposed Sale Price Is Fair and Reasonable.**

63.    For a substantial time and through its own efforts, the Debtor attempted to locate a purchaser of its business, including many racetrack owners.  Although at least four (4) potential purchasers conducted due diligence investigations, none made an offer for the property.  The Debtor also retained the services of The Riderwood Group, Inc. to market the business.  Despite the various efforts at marketing, Future LLC has been the only potential purchaser to make an offer for the Debtor's assets.  First, Future LLC proposes to purchase the assets of the Debtor by

2449915.1

assuming the debt owed to PNC Bank.  Second, Future LLC will pay the Debtor the sum of

$100,000 for certain of its personal property.  Third, Future LLC will cure the defaults under the

executory contracts assigned by the Debtor to Future LLC.  By curing the defaults, Future LLC

will satisfy certain prepetition unsecured debts.  The Debtor believes that such a sale price

constitutes a fair and reasonable price for the Debtor's assets.

**D.      The Sale Was Negotiated in Good Faith.**

64.     A good faith analysis in the Section 363(b) context focuses principally upon the

good faith of the purchaser.  Neither the Bankruptcy Code nor the Rules define "good faith.  The

Seventh Circuit in *In re Rock Industries  Machinery Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)

approved the following definition:

> The requirement that a purchaser act in good faith…. Speaks to the
> integrity of his conduct in the course of the sale proceedings.  Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

65.     The purchaser in this instance is a newly formed entity.  Thus, we will examine

the good faith of the managing member, Mark Vogel.  Mr. Vogel has negotiated fairly with the

Debtor.  There has been no fraudulent conduct associated with the offer to purchase and no

collusion with the Debtor.  Finally, there have not been any other bidders, and, thus, there was no

attempt to take any unfair advantage of such bidders.

66.     Full disclosure is an important consideration in the determination of good faith.

Here, the Debtor has made full disclosure concerning its assets and liabilities.  It also fully

disclosed the identity of the bidder and the fact that the managing member of the bidder is a

former owner of Rosecroft Raceway.  The salient terms of Future LLC's bid is described in this

Motion and the sale agreements are attached to this Motion for review by parties in interest.

2449915.1

Although approval of the Purse Agreement between the Debtor's parent company and Future

LLC is not sought, the Debtor has fully disclosed the terms of such agreement.  There was no

fraudulent collusion between Future LLC and the Debtor.

67.    The Debtor has met the requirements outlined in the sound business reason test.

There is a sound business reason for the sale of the assets outside of the plan context.  The notice

prepared by the Debtor adequately describes the sale and the nature of the purchaser.  The price

is fair and reasonable and the sale was negotiated in good faith.

### Authority to Sell the Debtors' Assets Free and Clear of Liens and Encumbrances Pursuant to § 363(f)

68.    In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession

may sell property under section 363(b) "free and clear of any interest in such property of an

entity other than the estate" only if one of the following conditions is satisfied:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re General Bearing Corp.*, 136 B.R. 361, 366 (Bankr. S.D.N.Y. 1992)

(listing requirements); *see also In re Collins*, 180 B.R. 447, 449-50 (Bankr. E.D. Va. 1995)

("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions

must be met in order for the Court to approve the proposed sale."); *In re P.K.R. Convalescent*

*Centers, Inc.*, 189 B.R. 90, 93-94 (Bankr. E.D. Va. 1995) (Tice, J.) ("[Section] 363 covers more

2449915.1

situations than just sales involving liens…Section 363(f) addresses sales free and clear of any interest…").

69.     On or before the hearing on this Motion, the Debtor anticipates that PNC Bank will consent to the sale pursuant to 11 U.S.C§ 363(f)(2), or Future LLC will obtain other financing, permitting it to meet the requirements of 11 U.S.C. § 362(f)(3).

70.     Accordingly, the Debtor submits that the sale of the Debtor's assets free and clear of any liens, claims and encumbrances satisfies the statutory prerequisites of section 363(f)(2) as to the lien held by PNC Bank.

<u>**Conclusion**</u>

WHEREFORE, the Debtor respectfully requests that this Court enter an Order (i) authorizing the sale of substantially all of the Debtor's assets to Future LLC, free and clear of liens, claims and encumbrances in accordance with the Real Estate Agreement and the Personal Property Agreement, (ii) approving the Real Estate Agreement and the Personal Property Agreement, (iii) authorizing the Debtor to consummate the transactions contemplated by the Real Estate and Personal Property Agreements, and (iv) granting such other relief that this Court deems necessary and proper.

Dated: December 11, 2009                         /s/ Nelson C. Cohen
                                                                Nelson C. Cohen (08994)
                                                                Zuckerman Spaeder LLP
                                                                1800 M Street, NW, Suite 1000
                                                                Washington, DC  20036
                                                                (202)778-1800 — Telephone
                                                                (202) 822-8106 — Facsimile
                                                                ncohen@zuckerman.com — E-Mail

                                                                *Counsel for Debtor*

2449915.1

## CERTIFICATE OF SERVICE

I, Nelson Cohen, hereby certify that on this 11th day of December, 2009, a copy of the

foregoing Motion and Proposed Order were sent electronically to:


Jeanne M. Crouse, Esq.
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, MD  20770

Michael D. Nord, Esq.
Jason W. Hardman, Esq.
Gebhardt & Smith LLP
1 South Street, Suite 2200
Baltimore, MD  21202

Lawrence D. Coppel, Esq.
Susan J. Klein, Esq.
Gordon, Feinblatt, Rothman,
Hoffberger & Hollander, LLC
233 East Redwood Street
Baltimore, MD  21202

Howard M. Heneson, Esq.
Howard M. Heneson, P.A.
810 Gleneagles Court, Suite 301
Towson, MD  21286

Jonathan R. Krasnoff, Esq.
Bruce C. Spizler, Esq.
Office of the Attorney General
500 North Calvert Street, Suite 406
Baltimore, MD  21202

Darek Bushnaq, Esq.
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, MD  21202

Joseph A Lynott, III, Esq.
Lynott, Lynott & Parsons, P.A
11 N. Washington Street
Suite 220
Rockville, MD  20850

2449915.1

Scott W. Foley, Esq.
Shapiro Sher Guinot & Sandler
36 S. Charles St., 20th Floor
Baltimore, MD  21201-3147

Robert H Rosenbaum, Esq.
Meyers, Rodbel & Rosenbaum, P.A.
6801 Kennilworth Ave., Suite 400
Riverdale, MD  20737


and via United States First Class Mail to the following:

Finger Lakes Racing, Association, Inc.
c/o Marvin T. Dubin, Esq
600 Rand Building
Buffalo, NY  14202

Steve P. Xanthos
12328 Pulaski Highway
Joppa, MD  21085


/s/ Nelson C. Cohen
Nelson C. Cohen

2449915.1