Date signed April 02, 2010

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MARYLAND

at Greenbelt

PAUL MANNES
U. S. BANKRUPTCY JUDGE

IN RE: :
 :
CLOVERLEAF ENTERPRISES, INC. : Case No.
 :   Chapter 11
 Debtor :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

### MEMORANDUM OF DECISION

Before the court is the renewed motion of Debtor Cloverleaf Enterprises, Inc. ("CEI" or "Debtor") [D.E. No. 184] to sell substantially all of its assets free and clear of all liens, claims and encumbrances. The motion is opposed by the Maryland Jockey Club of Baltimore City, Inc., Laurel Racing Association Limited Partnership, Maryland Thoroughbred Horsemen's Association, Inc., the Maryland Horse Breeders' Association, Inc. (herein referred to collectively as "TB"), the United States Trustee and the Maryland Racing Commission.[1]

The prospective purchaser is a new company formed for the purpose of buying the Debtor's assets, Rosecroft Future, LLC ("Future, LLC"), that is funded by Mark Vogel, the one time owner of the facility known as the Rosecroft Race Track, a Standardbred ("SB") facility located in Prince George's County, Maryland. To that end, he acquired the $6,771,145.06 claim (No. 42) filed by PNC Bank that is secured by a lien upon substantially all of Debtor's assets. The proposed transaction consists of three materially interdependent contracts. These are an Amended and Restated Purchase and Sale Agreement [Debtor's Ex. No. 2 ], a Personal Property (Operating Assets) Purchase Agreement [Debtor's Ex. No. 1] and an Amended and Restated Purse Agreement between Future, LLC and Cloverleaf Standardbred Owners' Association

---

[1]The limited objection of the Commission relates to the court's conditioning the sale upon the Commission's approval of the licensure of the purchaser and the purchaser's cooperation in the process as required by COMAR 09.10.04.03(C)(3). While the purchaser does not take issue with this condition, the court finds that Mr. Vogel has been less than diligent in his effort to procure the license.

("CSOA"), Debtor's parent company [Debtor's Ex. No. 3] (collectively, the "Agreements").  All must be consummated as a condition precedent to the Sale Agreement's efficacy.

The Agreements provide for the sale of the following assets:

1. **Real property** - This consists of 124.32 acres of property located in Prince George's County, Maryland, that is improved by parking lots, grandstands, a clubhouse, a restaurant and horse stables.  No current appraisal of the real property was offered in evidence, although there is evidence of a $9.9 million appraisal of the real estate in 2007 [Horsemen Association's Ex. No. 1]. The real property is assessed by the Maryland State Department of Assessments and Taxation at $12.5 million, but neither of these valuations may be considered as evidence of the present fair market value of the real estate.

2. **Personal property** - This consists of all of the tangible and intangible personal property owned by the Debtor excluding only Debtor's cash on hand, all retirement and benefit plans, and all sums and credits due Debtor as a member of the two limited liability companies that are the cornerstones of this transaction (namely, a 20% share of the revenues from the New Maryland OTB Facilities LLC and the Maryland OTB Facilities LLC) [Debtor's Ex. No. 1].

The consideration for the sale of Debtor's assets is the assumption or paying off of the sum of $6,771,145.06, that was owed to PNC Bank and secured by the Debtor's assets, so that PNC would no longer have any claim against the Debtor, as well as a payment for $100,000.00 for the Debtor's personal property and the assumption of $331,432.00 of unsecured debt.

As of this date, allowed claims include priority claims of $305,857.34 and unsecured claims aggregating $4,710,372.99.  Among the unsecured claims are a $300,000.00 claim (No. 44) filed by The Maryland Race Track Employees Pension Fund, an estimated claim (No. 50-4) in the same amount filed by the Maryland  Harness Track Employees Pension Fund, a $600,000.00 claim (No. 35) filed by CSOA, a $828,159.74 claim (No. 22) filed by the Maryland Thoroughbred Horsemen's Association, and a $1,762,042.00 claim (No. 14) filed by the

Maryland Jockey Club of Baltimore City.[2]

The opponents to the motion are competitors of the Debtor for the gambling dollar, so the court takes the high-minded tone of their objections relating to the public interest and the racing industry with a grain of salt. The court believes that they would not be disappointed in the least were CEI to disappear from the scene, so that they would not have to share any portion of the Maryland gambling dollar with them.  But, as with 11 U.S.C. § 1126(e), the court will not ignore their opposition on the basis that they are acting with an ulterior or coercive purpose in that they are acting in accord with their perception of self-interest.  *In re Federal Support Co.*, 859 F.2d 17, 19 (CA4 1988). The requirement of good faith does not require that they act in selfless disinterest..

While the Debtor may be described as a SB track, it is operating as such on a very limited basis, with only nine racing days scheduled for 2010.  The court understands that it is closing its "backstretch facilities" as of May 1, 2010, so that any horses would have to be trucked in from another location. It is first and foremost an off-track betting ("OTB") facility simulcasting SB and Quarter horse races from operating tracks. Because of its failure to make payments due under the 2006 Cross-Breed Memorandum of Understanding Between Laurel Park, Pimlico Race Course and Rosecroft Raceway and the Respective Horsemen and Breeders Organizations (the "2006 Cross-Breed Agreement") [Debtor's Ex. No. 16], it no longer is able to simulcast thoroughbred races.  Its hopes to place slot machine on the premises have been dashed by the Maryland state legislature.  Under Mr. Vogel's business plan, other forms of gambling may be established on the premises. The court finds that his interest is not one of promoting SB racing, but rather of promoting a gambling enterprise, and the purchase of the Rosecroft facility provides him with a ticket to get into the game.

Sales of substantially all of a debtor's assets are authorized under 11 U.S.C. § 363(b)(1)

---

[2] The docket reflects two applications for interim compensation filed by Meyers, Rodbell &. Rosenbaum, P.A., Special Counsel for Debtor [D.E. No. 388] and by Zuckerman Spaeder LLP, General Counsel for Debtor [D.E. No. 390]. These applications seek second priority administrative expenses under 11 U.S.C. § 503(b)(2) of $185,075.00 and $693,751.25, respectively.

of the Bankruptcy Code.[3]  However, as the Bankruptcy Code contemplates in chapter 11 that sales of all of a debtor's asset take place under 11 U.S.C. § 1123(b)(4) after disclosure of and balloting on a Plan of Reorganization or Liquidation, sales of all assets outside of a plan in a case under Chapter 11 are extraordinary and should be viewed as an exception to the rule. As pointed out in *Collier on Bankruptcy* ¶361.02[3] at 363-17 (15th ed. rev. 2009), "[b]ecause there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court." *See In re Abbotts Dairies of Pa., Inc*. 788 F.2d 143, 150 (CA3 1986).  Courts approving sales pursuant to Section 363(b)(1), such as *In re Lionel Corp.,* 722 F.2d 1063, 1071 (CA2 1983), *In re Naron & Wagner, Chartered*, 88 B.R. 85 (B.C. Md. 1988) and *In re Gulf Coast Oil Corp*., 404 B.R. 407 (B.C. S. D. Tex. 2009), have fashioned tests for approval.  Among the matters that the court must consider are:

1. whether the proposed sale is in the debtor's sound business judgment;
2. whether there is a valid business justification to sell the assets through a Section 363 sale rather than through a Chapter 11 Plan;
3. whether there is sufficient notice to inform all creditors and interested parties of the effect of the sale on the distributions to creditors;
4. whether sales notice is the functional equivalent of a disclosure statement; and
5. whether the sale recognizes the fiduciary duties owed by the debtor in possession to all creditors and interest holders.

Finally, as the Fifth Circuit recognized in the case of *In re Braniff Airways, Inc*., 700 F.2d 935 (CA5 1983), section 363 does not authorize a debtor and the bankruptcy court "to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection" with a proposed transaction. *Id*. at 940.  When a proposed transaction specifies terms or coerces one result for adopting a reorganization plan, "the parties and the district court must scale the hurdles erected in Chapter 11. *See e.g.*, 11 U.S.C. § 1125 (disclosure requirements); id. § 1126 (voting); id. § 1129(a)(7) (best interest of creditors test); id. § 1129(b)(2)(B) (absolute priority rule)." *Id*. at 940. *See also* Craig A. Sloane,

---

[3] 11 U.S.C. § 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate[.]"

*The Sub Rosa Plan of Reorganization: Side-stepping Creditor Protections in Chapter 11*, 16 BANKR. DEV. J. 37 (1999).

This sale has been characterized by counsel as the only option available to Debtor. At the hearing on this matter, Debtor's counsel testified that, if the motion to sell was approved, the Chapter 11 plan to be proposed would "essentially be a liquidation plan with a preservation to the debtor of claims against third parties which the [D]ebtor would then propose to continue for the benefit of unsecured creditors"[4] [D.E. No. 362, Transcript of Hearing held January 13, 2010, p. 5]. If not approved, the proposition is that the Debtor will run out of money and the enterprise will crater.[5] That may well be the result. But who benefits from the proposed transaction? Certainly not the unsecured creditors as the sale will only produce funds to pay a portion of the administrative expenses and the promised payment of a small portion of the unsecured claims that are assumed by the prospective purchaser. The SB horsemen might have the benefit of nine racing days, but with the closing of the backstretch facilities on May 1st, who will be around to benefit from that short racing schedule?

What the Debtor did here is to decide, at the time of the filing of the case, that it would sell out to Mr. Vogel. To that end, it negotiated an agreement that precluded the marketing of its assets to anyone else. *See Gulf Coast Oil Corp.*, 404 B.R. at 424 ("The principal justification for § 363(b) sales is that aggressive marketing in an active market assures that the estate will receive maximum benefit."). The only beneficiary of this transaction is its sole stockholder, CSOA,

---

[4]On July 6, 2009, Debtor filed an adversary proceeding (A.P. No. 09-00459) in this court. As amended, the Complaint sets forth eleven counts, each of which arises out of the 2006 Cross-Breed Agreement, against TB and a number of out-of-state tracks, among other entities and individuals. Asserting that "this adversary proceeding requires consideration of both Title 11 of the United States Code and the intracasies of other laws of the United States regulating organizations or activities affecting interstate commerce, specifically, the Sherman Act §§ 1 and 2 and the Interstate Horse Racing Act", several of the Defendants filed a Joint Motion for Withdrawal of Reference of Adversary Proceeding [D.E. No. 106]. The adversary proceeding was subsequently removed to U.S. District Court (No. 8:10-cv-00407-RDB).

[5]However, on cross-examination, Kelly Rogers, Debtor's chief executive, acknowledged that the proposed budget submitted by Debtor to the Maryland Racing Commission reflected net income after taxes of $44,000.00 for the year 2010 [D.E. No. 360, Transcript of Hearing held January 12, 2010, pp. 37-39].

which stands to reap a remarkable dividend should everything fall into place under the Amended and Restated Purse Agreement. Moreover, the keystone of the proposed transaction is that Future, LLC will reap the benefits of the OTB electronic wagering agreement without having to assume the 2006 Cross-Breed Agreement and its obligation to make an annual payment of $5.9 million to the TB interests.[6] When assuming a contract, however, a debtor cannot cherry pick among the provisions of the contract. It has long been the law that a contract is assumed by a debtor *cum onere* and that a debtor must accept the obligations along with the benefits. *In re Cold Spring Realty,* 15 F.2d 885 (D. Md. 1926); *In re Shangra-La, Inc.* 167 F.3d 843, 849 (CA4 1999). Given the foregoing, the court cannot find that the proposed sale is an exercise of sound business judgment by the Debtor nor that it recognizes the fiduciary duties owed by the Debtor to all of its creditors and interest holders.

The court further finds that the sales notice cannot be considered as having the slightest resemblance to the disclosure statement that must accompany a plan of reorganization. Pursuant to 11 U.S.C. § 1125(a), the disclosure statement must contain "adequate information"[7] regarding the affairs of the debtor that will enable the creditor to make an informed decision on whether to accept the plan of reorganization. *See generally Collier on Bankruptcy* ¶1125.02[2] at 1125–9-10 (16th ed. rev. 2009). A key disclosure involves a liquidation analysis setting forth the

---

[6]Section 1.B(i) of the Personal Property (Operating Assets) Purchase Agreement, provides, in relevant part, as follows: "Seller sells and assigns and Buyer accepts all of Seller's rights, title and interest to receive twenty percent (20%) of the proceeds from Electronic Wagering (telephone, cable and internet) as identified in both the Cross-Breed Horseracing Revenue Sharing and Operations Agreement of January 1, 2000 ... and the [2006 Cross-Breed Agreement] accruing after the close of business on the day prior to Closing. By accepting this assignment of income to accrue in the future, Seller does not transfer and Buyer does not assume any liability at all under the [2006 Cross-Breed Agreement] and affirmatively disavows such liability."

[7]Section 1125(a)(1) defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]"

estimated return that creditors would receive under chapter 7. *Id.* at 1125-10. Here, nothing was presented as to the value of the real estate owned by the Debtor that has been valued at between $9.9 and $12.5 million in the past. Likewise, Debtor offered no evidence to rebut the testimony of the objecting parties' expert witness, Raymond Peroutka, that Debtor's membership interests in Maryland OTB Facilities LLC and the New Maryland OTB Facilities (which are sought to be sold through the proposed transaction) have fair market values, respectively, of $3,633,191.00 and $1,195,355.00. Under 11 U.S.C. § 1129(7)(a)(ii), confirmation can be had over the objection of a non-accepting class only if members of that class "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]" The Debtor's "sell or die" proposal does not provide the essential information required to enable the court to cram it down the throats of the objecting parties.

Considering the presentation as a whole, the court finds from the record as it currently exists that the Debtor proposed a sale that primarily benefits its sole shareholder, CSOA, while providing woefully inadequate notice of this sale to all other parties. In so doing, it fell short in carrying out its duty to act as a fiduciary for all creditors and interest holders. "But so long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession." *Wolf v. Weinstein,* 372 U.S. 633, 649 (1963); *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355-356 (1985); *In re Silver Oak Homes, Inc.,* 167 B.R. 389, 394-395 (B.C. Md. 1994). Debtor may well produce sufficient evidence to confirm a plan over the objection of the parties opposing this sale, but that is for another day. An appropriate order will be entered.

cc:	Debtor
	Debtor's Counsel
	U.S. Trustee
	Jonathan R. Krasnoff, Assistant Attorney General, Office of the Attorney General, 500
		North Calvert Street, Ste. 406, Baltimore, MD 21202
	Lawrence D. Coppel, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, 233
		East Redwood Street, Baltimore, MD 21202
	Darek Bushnaq, Venable LLP, 750 East Pratt Street, Suite 900, Baltimore, MD 21202

Michael D. Nord, Gebhardt & Smith LLP, 1 South Street, Ste. 2200, Baltimore, MD 21202
Joseph A. Lynott, III, Lynott, Lynott & Parsons, P.A., 11 N. Washington Street, Ste. 220 Rockville, MD 20850
Scott W. Foley, Shapiro Sher Guinot & Sandler, 36 S. Charles Street, 20th Fl., Baltimore, MD 21201
Robert H. Rosenbaum, Meyers, Rodbell & Rosenbaum, P.A., Kenilworth Ave., Ste. 400 Riverdal, MD 20737
All Creditors and Parties Requesting Notice